Amanda L. Groves (SBN: 187216)
Nicole M. Norris (SBN: 222785)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
Email: agroves@winston.com

Attorneys for Defendant
CAPGEMINI U.S. LLC f/k/a/ CAP GEMINI
ERNST & YOUNG U.S. LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| PACIFIC HEALTH ADVANTAGE dba PAC ADVANTAGE, <br><br> Plaintiff, <br><br> vs. <br><br> CAP GEMINI ERNST & YOUNG U.S. LLC, <br><br> Defendant. | Case No.  C07 1565 PJH <br><br> **DECLARATION OF JAMES FARNSWORTH IN SUPPORT OF MOTION TO DISMISS, OR ALTERNATIVELY, TO TRANSFER FOR IMPROPER VENUE** <br><br> Date:   May 2, 2007 <br> Time:   9:00 a.m. <br> Dept:   Courtroom 3, 17th Floor <br> Judge: Hon. Phyllis J. Hamilton |

I, James Farnsworth, declare as follows:

1.      I am the Associate General Counsel in charge of the western region for defendant Capgemini U.S. LLC f/k/a Cap Gemini Ernst & Young U.S. LLC ("Capgemini" or "Defendant") and have held that position since January 1, 2006.  I have personal knowledge of the facts herein, and if called as a witness could and would competently testify thereto.

2.      The dispute that is the subject of this lawsuit lies within my area of responsibility in the western region. As part of my responsibilities, I personally have reviewed the legal files related to Capgemini's engagement by plaintiff Pacific Health Advantage dba Pac Advantage ("Plaintiff"). Such files are maintained by my department in the ordinary course of business, and the documents

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1

1  therein prepared or received by Capgemini employees in the ordinary course of Capgemini's

2  business.

3      3.    Among the files I reviewed is an executed December 18, 2002 Letter of

4  Understanding (the "LOU") between Capgemini and Plaintiff, with the Appendices attached thereto,

5  including the Terms and Conditions at Appendix A. A true and correct copy of that document is

6  hereto as Exhibit A

7      I declare under penalty of perjury of the laws of the United States of America that the

8  foregoing is true and correct, and this declaration was executed this 23rd day of March, 2007 in

9  New York, New York.

JAMES FARNSWORTH

DECLARATION OF JAMES FARNSWORTH ISO S TO DISMISS, OR ALTERNATIVELY TO TRANSFER FOR IMPROPER VENUE
CASE NO. C 07 1565 PJH

SF:156899.1

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

# EXHIBIT A



**Cap Gemini Ernst & Young Health**
*Health and the enterprise*

565 California Street
Suite 1600
San Francisco, CA 94104

(415) 951-3200
www.us.cgey.com/health

December 18, 2002

Ms. Leesa Tori
Director
PacAdvantage
221 Main Street, Suite 1500
San Francisco, CA 94105

Re:   PX2 Implementation Management

Dear Ms. Tori:

We appreciate the opportunity to be of service to PacAdvantage in the provision of software implementation management services.   Pacific Health Advantage (PacAdvantage) is a subsidiary of the Pacific Business Group on Health and is the former Health Insurance Pool of California.   PacAdvantage contracts with quality medical, dental, vision and chiropractic insurance plans to offer health insurance coverage to small businesses. PacAdvantage is currently offered to 15,000 small businesses and approximately 140,000 employees and dependents.

## Our Understanding

PacAdvantage has contracted with Benefit Partners, Inc. (BPI) of Roseville, CA, a third party administer, to provide insurance enrollment and eligibility services for the PacAdvantage insurance program.   For more than the last 14 months, BPI has been working with outsourced information technology management and software vendors on the implementation of a new software application to carry out their enrollment, finance / premium billing and payment, and sales functions.   This includes migrating from the existing client server architecture enrollment application system to an n-tier architecture using Java based applications.   Phoenix, the existing custom system is Pick operating system based and was written by Visual World.   BPI contracted with Mascon Global Limited to develop PX2, a new n-tier architecture Java based custom application using IBM Websphere and DB2.

BPI also contacted with R Systems, Inc (RSI) of El Dorado Hills, CA to manage their information technology needs, including network and database administration, website management, help desk services, e-mail services, file, print and backup services in addition to the voice and data infrastructure.

The implementation of PX2 is more than two months behind schedule.   PX2 was scheduled to be operational by October 9, 2002.   The contract with Visual World for the Phoenix application

CCaassee13007eovv0375255CPMH DDocoouementn2-66 FFiileddd0352312220007 FPaagge5566of1330



December 18, 2002

Ms. Leesa Tori

Page 2

was terminated effective December 1, 2002 in anticipation of the successful implementation of a new custom written enrollment application. There are significant applications and technical problems with the implementation of PX2, e.g., inability to load new enrollment, record locking. PacAdvantage is under contract to enroll approximately 10,000 new members in December and significantly more members in January.

Both Mascon and RSI have provided additional staff to attempt to resolve the implementation issues. The teams are working 7-day weeks around the clock to attempt to resolve the problems. PacAdvantage is concerned PX2 will not be operational in a reasonable time and requests consulting assistance to analyze the situation, recommend a direction and manage the implementation teams to resolve the issues. Specifically, PacAdvantage has requested assistance with:

- Ongoing project management of health care enrollment and financial software application implementation
- Scope management
- Communications management
- Continuous gap analysis
- Coordination across all parties (BPI, Mascon, RSI)
- Conflict resolution
- Creative problem solving
- Facilitation
- Leadership

We understand PX2 is a mission critical application for BPI and PacAdvantage. PacAdvantage would like the PX2 application to be functional as quickly as possible. At the same time, you recognize it is a difficult process to identify and resolve the open issues due to the complexities of custom software development and implementation. The multiple parties and off-shore development involved in the design and implementation effort further complicate this situation.

This letter addresses the scope, duration and staffing for this effort.

### Project Scope and Approach

PacAdvantage has requested immediate assistance to scope the PX2 implementation issues, recommend a course of action and lead BPI, Mascon and RSI to resolve the issues. Our initial efforts will focus on:

- Understand the current state of the application including software and hardware architecture and open incidents
- Understand the perspective of each of the parties regarding implementation issue resolution
- Review application specifications
- Review testing protocols and use cases
- Review user training procedures

②

Case 3:07-cv-03752-CRH   Document 2-6   Filed 05/28/2007   Page 6 of 30



December 18, 2002

Ms. Leesa Tori                                                    Page 3

- Review data conversion procedures
- Review software and hardware configuration
- Identify and direct the team to implement short term issue resolution strategies
- Facilitate the cooperation and communication between BPI, Mascon and RSI resources

Following our initial assessment, we will develop and review with you the longer-term strategy to identify and resolve open issues related to the use of the PX2 application. Possible courses of action may include

- Detailed application requirements review
- Application software modifications
- Additional unit and/or integration and regression testing
- System software configuration changes
- Hardware configuration changes
- Additional training
- Recommendation of on-going vendor participation levels
- Recommendation of contingency strategies to be used until the PX2 application can be made available for use.

## Assumptions

1. BPI, Mascon and RSI resources will work together to resolve open issues.
2. The assigned resources will work a time schedule that will provide maximum focus on resolving open issues including 10 to 16 hour days, as required.
3. Mascon and RSI will take responsibility for application and hardware modifications
4. A private office will be provided to our Project Manager so that he can conduct meetings as required. This office will have at least one speakerphone for conference calls and an analog phone line or Internet connection to permit access to the CGE&Y network. Access will also be provided to a network or stand-alone printer for our laptop.

## Proposed Project Team

For this project, we propose the following staffing. These individuals are representative of the skills and experience of the staff we expect to assign to this project. However, depending on exact timing of this project, the specific individuals below may not be the actual project team, but represent the experience and qualifications of comparable staff.

**Ira Rothman**, Principal, will serve as Engagement Executive. In this role, Ira will be involved in structuring and reviewing key deliverables, will participate in key meetings, and will have overall responsibility for supervising CGE&Y's work on this engagement.

**Richard Bullard**, will serve as *Project Manager* and primary day-to-day resource, and

③



December 18, 2002

Ms. Leesa Tori

Page 4

will leverage his project management, functional, technical and development experience for this effort.

**Scott Whyte** and **Haissam Issa** will provide Technical Support as necessary. This will be primarily on a remote basis.

CGE&Y will draw upon other subject matter specialists on an "as needed" basis throughout the project duration.

## Timing and Fees

We are prepared to immediately begin work on this important assignment. Richard Bullard is prepared to begin work on-site as soon as we receive your approval. Ira Rothman will be on vacation from December 21 through January 1 and have limited telephone access during this time. Richard Bullard will need to work remotely from December 31 through January 5. The staffing level and assignment will be reassessed, jointly with you, on January 2.

Due to the high variability of the scope and work effort, we have estimated our fees on an hourly basis plus out-of-pocket expenses, e.g., travel, lodging, communications. Our fees for this assignment are as follows:

- Ira Rothman          $445 / hour
- Richard Bullard      $300 / hour
- Haissam Issa         $306 / hour
- Scott Whyte          $423 / hour

We estimate Richard Bullard will expend the majority of the effort for the period of December 20 through January 1. Based on our discussion, we would expect he would work between 10 and 16 hours per day on this assignment on a 6-day week basis. Based on our assessment on January 2, we will jointly determine the mix of staff going forward. We will provide you with weekly status reports and hours expended by resource. PacAdvantage is not obligated to engage services from CGEY beyond the initial assessment. Billing is hourly, an incurred, and we may agree that services are no longer needed before any estimated completion of the assessment occurs.

As the engagement progresses, we may find that additional tasks need to be performed that are beyond the scope of the tasks described in this letter or that additional effort beyond what was originally anticipated will be needed. For example, if the information that is provided to us is incomplete or inaccurate, if we don't receive the assistance we are anticipating, the scope and/or timing of our services may change from that described in this letter. While we are pleased to provide additional value-added assistance, we will discuss any changes in the tasks or our services, including any out-of-scope items, with you to obtain your approval prior to proceeding.

(4)



December 18, 2002

Ms. Leesa Tori

Page 5

In addition to our professional fees, we will bill for direct expenses incurred on behalf of PacAdvantage, including travel, communication, report production, delivery charges and other out-of-pocket expenses. We propose to bill PacAdvantage for the first week estimated effort (i.e., Richard Bullard at 72 hours or $21,600) at the initiation of this project and will expect payment within 10 days of the date of the invoice. We will bill you on a bi-weekly basis for our services and expect payment within 10 days of our invoice.

\* \* \* \* \* \* \* \*

DEC 21'02 10:11 FR PAC ADVANTAGE & BPI   916 786 2835 TO 9802789          P.06/03



December 18, 2002

Ms. Leesa Tori

Page 6

We appreciate the opportunity to submit this letter and look forward to working with PacAdvantage on this important initiative. Should you have any questions, ideas or concerns regarding this document, I am certain we can further tailor our approach to meet your needs. Please contact Ira Rothman at (415) 951-3217 (office) or (916) 508-0988 (cell) with any questions you may have regarding this material. To authorize CGE&Y to begin work on this engagement on the basis of the work plan and investment described herein, please sign and return one copy of this letter.

Sincerely,

Ira Rothman, Principal
Cap Gemini Ernst & Young
Health Consulting

If any portion of this letter is held to be void, invalid or otherwise unenforceable, in whole or part, the remaining portion of this letter shall remain in effect.

Agreed to and accepted for **PacAdvantage** by:

Leesa Tori   Director
Name and Title

12-20-02
Date

Attachments
  Appendix A  CGE&Y Terms and Conditions

Case 1:07-cv-03753-GMH    Document 2-8    Filed 03/28/2007    Page 10 of 30

APPENDIX A

## TERMS AND CONDITIONS
## FOR HIPAA SERVICES

I.     Services.  It is agreed that Cap Gemini Ernst & Young U.S. LLC ("CGE&Y") will provide
consulting services (the "Services") in connection with certain regulations promulgated by the U.S.
Department of Health and Human Services under the Health Insurance Portability and Accountability Act
of 1996 ("HIPAA"), which Services are described in the accompanying Letter of Understanding to which
this Appendix A is attached (such accompanying Letter of Understanding, the "Letter"; the Letter and this
Appendix A and all attachments hereto, collectively, this "Agreement"), to the client named in this
Agreement ("Client"), as an independent contractor, provided that Client pays, in a timely manner, all of
the fees and expenses set forth in this Agreement.  This Agreement constitutes the entire and sole
agreement between Client and CGE&Y and merges all prior and contemporaneous communications with
respect to the subject matter hereof.  This Agreement shall not be amended or otherwise modified, except
by a later written agreement that expressly states that it is such an amendment or modification and that is
signed by both parties.  Except as set forth in such amendment or modification, no provision or statement
in any document delivered in connection with this Agreement shall impose any additional obligation on
CGE&Y.  Nothing contained herein shall be construed to create an employment or principal-agent
relationship, or a partnership or joint venture, between CGE&Y and Client, and neither party shall have
the right, power or authority to obligate or bind the other in any manner whatsoever.

II.    Changes and Delays.

A.     Changes.

1.      The parties acknowledge and agree that the occurrence of the following events
(each, an "Adjustment Event") may require an extension in the schedule and/or an increase in the fees and
expenses and/or an increase in the work CGE&Y is to perform: (a) a material change to or deficiency in
the information which Client has supplied to CGE&Y; (b) a failure by Client and/or vendors to perform
any of their respective responsibilities under this Agreement in a timely manner, including, without
limitation, the supply to CGE&Y of adequate resources and information; (c) an unanticipated event that
materially changes the service needs or requirements of Client; (d) circumstances beyond the reasonable
control of either of the parties, including actual or potential year 2000 defects, acts of God or other Force
Majeure Events (as defined herein); (e) a change in law; or (f) any assumption in the Letter not being
fully realized.

2.      The parties also agree that from time to time during the term of this Agreement,
Client may request, or CGE&Y may propose, that CGE&Y implement a change to the Services which
may require an extension in the schedule and/or an increase in the fees and expenses and/or an increase in
the work CGE&Y is to perform (each, a "Change"), including: (a) a change to the scope or functionality
of the Deliverables (as defined herein); (b) a change in the prioritization or manner in which CGE&Y is
performing the Services; or (c) a change to the scope of the Services.

3.      In the event an Adjustment Event occurs or the parties agree on a Change,
CGE&Y may prepare and provide to Client a proposed change order identifying the impact and setting
forth any applicable adjustments in the schedule and/or payments to CGE&Y.  An authorized
representative of each party shall promptly sign each such proposed change order to acknowledge the
impact and to indicate that party's agreement to the adjustments.  In the event the parties' respective
authorized representatives reach agreement, the agreed upon adjustments shall constitute Services.  In the

Rev03.03

event that the parties' respective authorized representatives disagree in this regard, they shall promptly negotiate the same in good faith. If they are unable to reach an agreement, they shall refer that matter to the parties' respective executive management representatives, who will meet or confer by telephone conference as promptly as practical and in any event within ten (10) business days to negotiate the same in good faith in an attempt to reach an agreement. If the parties fail to reach an agreement, CGE&Y shall not be obligated to perform any additional or modified Services and either party shall be free to pursue alternative remedies.

      B.     Delays. Notwithstanding Paragraph A of this Section II, if any delays or deficiencies in the Services or Deliverables occur as a result of Adjustment Events or Changes, the scheduled completion date for the affected Services and Deliverables shall be extended to the extent of any such delays and CGE&Y shall not incur any liability to Client as a result of such delays or deficiencies. If such delays last for an aggregate of thirty (30) days or more, CGE&Y shall be entitled to terminate this Agreement by giving written notice to Client, such termination to be effective on the date indicated in said notice.

III.    Warranty and Liability.

      A.     CGE&Y warrants that it will exercise due professional care and competence in the performance of the Services. CGE&Y will, to the extent applicable to the Services described in the Letter, take into consideration the requirements of compliance with the Standards for Electronic Transaction and Code Sets published on August 17, 2000, 65 Fed. Reg. 50312, the Standards for Privacy of Individually Identifiable Health Information published on August 14, 2002, 67 Fed. Reg. 53181, and the Security and Electronic Signature Standards published on February 20, 2003, 68 Fed. Reg. 8334 (collectively, the "HIPAA Regulations"), in each case, as of the compliance date set forth in the applicable HIPAA Regulations. There has been no comprehensive, formal interpretation of the HIPAA Regulations. CGE&Y expressly disclaims any further warranty with regard to HIPAA, the HIPAA Regulations or any other regulations promulgated thereunder.

      B.     CGE&Y warrants that any computer software that (i) is produced exclusively by CGE&Y hereunder with software tools selected entirely by CGE&Y, and (ii) processes dates as a material part of its function, is designed to correctly operate with dates occurring on and after January 1, 2000, provided that any and all dates that are entered into or otherwise supplied for processing by such software are unambiguous as to date, in the correct format and otherwise accurate. Except as provided in this paragraph, CGE&Y shall have no liability for any defect or problem arising out of or related to date processing in any of Client's systems.

      C.     Any claim for breach of the warranties in this Section III with respect to any of the Services must be made by written notice to CGE&Y within sixty (60) days of performance of such Services. For any breach of the warranties in this Section III, Client's exclusive remedy, and CGE&Y's entire liability, shall be the re-performance of such Services. If CGE&Y does not re-perform the Services as warranted under this Section III, Client shall be entitled to recover the fees paid to CGE&Y for such deficient Services.

      D.     To the fullest extent permitted by applicable law, the total aggregate liability of CGE&Y, regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, under this Agreement or with respect to the Services shall be limited to the fees paid to and retained by CGE&Y under this Agreement. If CGE&Y is working on a multi-phase engagement for Client, the total aggregate liability of CGE&Y shall be limited to the fees paid to and retained by CGE&Y for that particular phase that principally gives rise to the liability.

E. In no event will CGE&Y or Client be liable for consequential, incidental, indirect, punitive or special damages (including loss of profits, data, business or goodwill), regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages.

F. CLIENT UNDERSTANDS THAT CGE&Y IS PERFORMING THE SERVICES HEREUNDER IN RELATION TO SYSTEMS AND DATA THAT HAVE BEEN PRODUCED BY CLIENT, OR SUPPLIED TO CLIENT BY THIRD PARTIES, AND FOR ALL OF WHICH CGE&Y HAS NO RESPONSIBILITY. EXCEPT AS OTHERWISE STATED IN THIS SECTION III, CGE&Y MAKES NO WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, OR WARRANTIES OF ANY PRODUCTS OR SERVICES, OR THE APPROPRIATENESS OF CLIENT OR THIRD-PARTY SPECIFICATIONS. IN ADDITION, CGE&Y EXPRESSLY DISCLAIMS ANY WARRANTY OR LIABILITY WITH RESPECT TO DESIGN OR LATENT DEFECTS, EURO COMPLIANCE OR COMPLIANCE WITH LAWS, REGULATIONS, OR OTHER OFFICIAL GOVERNMENT RELEASES APPLICABLE TO CLIENT, WHICH SHALL BE THE SOLE RESPONSIBILITY OF CLIENT. Client acknowledges that it is a sophisticated party to this Agreement and recognizes and agrees that the terms of this Section III are an integral part of CGE&Y's pricing and an important factor in CGE&Y's willingness to enter into this Agreement and to agree to perform Services hereunder.

G. The Services may include providing assistance to Client with Client's procurement of third-party hardware, software or other items relating to the Services, which will be licensed or purchased by Client directly from the vendor or reseller (which may be an affiliate of CGE&Y) of such hardware, software or other items. CGE&Y makes no warranties of any kind with respect to such third-party hardware, software or other items. Client acknowledges and agrees that in the event that CGE&Y arranges for any third parties (including but not limited to affiliates of CGE&Y) to provide to Client any such hardware, software or other items, then, regardless of whether CGE&Y is compensated by any person or entity, such arrangement shall not constitute a conflict of interest, and Client retains sole responsibility for the selection of, and payment for, any such hardware, software or other items.

H. CGE&Y may perform the Services with personnel of CGE&Y or any of its affiliates (each, a "CGE&Y Entity" and, collectively, "CGE&Y Entities") or with subcontractors of CGE&Y Entities. CGE&Y shall be solely responsible for the performance of the Services and all of the other liabilities and obligations of CGE&Y under this Agreement, whether or not performed, in whole or part, by CGE&Y, any other CGE&Y Entity, or any subcontractor of any CGE&Y Entity. Client shall have no recourse against, and shall bring no claim against, any other CGE&Y Entity or any subcontractor of any CGE&Y Entity or any member, shareholder, director, officer, manager or employee of any CGE&Y Entity or any subcontractor of any CGE&Y Entity with respect to any liability or obligations herein or in connection with the Services.

I. Client specifically acknowledges that CGE&Y is not providing it with legal advice. To the extent applicable to any Services provided hereunder, Client will consult with and rely exclusively on its own legal counsel for legal advice in connection with the Services.

IV. Tools. If the Deliverables to be provided under the Letter include one or more of the proprietary tools of CGE&Y (each, a "Tool"), the additional terms and conditions pertaining to each such Tool shall be set forth in an applicable Annex hereto, which terms and conditions shall, in addition to the other terms and conditions herein, be applicable to such Tool.

V.    Security Services.  If the Services to be provided under the Letter include any technology or risk assessment or analysis services with respect to the security of the Client enterprise or the information systems of Client ("Security Risk Services"), and/or any discovery/scanning, exploitation, penetration, vulnerability assessment, related analysis, and other electronic or passive or intrusive security testing or procedures relating to the Client enterprise or the information systems of Client, using intrusive or passive techniques and/or software tools or by other means ("Security Testing Services") (the Security Risk Services and the Security Testing Services individually or collectively, "Security Services"), Client understands that some or all of such Security Services may be performed by a subcontractor to CGE&Y, as set forth in the Letter, and that the terms and conditions set forth in Annex II hereto, which terms and conditions are hereby incorporated by reference into this Section, shall, in addition to the other terms and conditions herein, be applicable to the provision of such Security Services.

VI.    Renovation, Validation and/or Implementation Services.  If the Services to be provided under the Letter include the renovation, validation and/or implementation of software owned or licensed by Client and used in its information systems and the related processes and/or documentation (collectively, "RVI Services"), the terms and conditions set forth in Annex I hereto, which terms and conditions are hereby incorporated by reference into this Section, shall, in addition to the other terms and conditions herein, be applicable to the provision of such RVI Services.

VII.    Confidentiality.

A.    In General.  Neither party shall disclose to a third party Confidential Information (as defined below) of the other party.  The receiving party shall use the same degree of care as it uses to protect the confidentiality of its own confidential information of like nature, but no less than a reasonable degree of care, to maintain in confidence the Confidential Information of the disclosing party. The foregoing obligations shall not apply to any information that (a) is required to be disclosed by law, subpoena or other process, (b) is disclosed to a CGE&Y Entity or any subcontractor of a CGE&Y Entity in connection with its performance of the Services, or (c) is disclosed in connection with any dispute, claim or action between the parties.  Confidential Information means information related to the subject matter of the Letter and any of the projects thereunder (including any third party information), and the business of the disclosing party, which (i) derives economic value, actual or potential, from not being generally known to or readily ascertainable by other persons who can obtain economic value from the disclosure or use of the information, (ii) is the subject of efforts by the disclosing party or owner of the third party Confidential Information that are reasonable under the circumstances to maintain the secrecy of the information, and (iii) is identified by either party as "Confidential" and/or "Proprietary", or which, under all of the circumstances, ought reasonably to be treated as confidential and/or proprietary, including this Agreement.  Confidential Information shall not include any information that (1) is at the time of disclosure, or thereafter becomes, through a source other than the receiving party, publicly known, (2) is subsequently learned from a third party that does not impose an obligation of confidentiality on the receiving party, (3) was known to the receiving party at the time of disclosure, or (4) is developed independently by the receiving party.  The obligations of confidentiality hereunder shall continue for a period of three (3) years from the date of the last disclosure of Confidential Information hereunder.

B.    Protected Health Information.  If, and to the extent, the Services require CGE&Y to receive any protected health information as defined in the Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. part 160.103 ("Protected Health Information"), the terms and conditions set forth in Annex III hereto, which terms and conditions are hereby incorporated by reference into this Section, shall, in addition to the other terms and condition herein, be applicable to the provision of such Services as of April 14, 2003.  Prior to the disclosure by Client of any Protected Health Information to CGE&Y, Client shall provide the appropriate individuals with adequate notice of its

4

disclosure of Protected Health Information to CGE&Y and/or obtain any required consents or authorizations necessary for the disclosure of Protected Health Information.

VIII.     Deliverables and Acceptance.

A.      Rights to Deliverables.  Except with regard to any Tools, as to which the ownership and other rights shall be governed by the applicable Annex hereto pertaining to such Tools, upon full payment, CGE&Y hereby assigns to Client any and all rights, title and interest, including, without limitation, copyrights, trade secrets and proprietary rights, to the materials created by CGE&Y specifically for Client hereunder and required to be delivered to Client by virtue of their description or specification as a deliverable in the Letter (the "Deliverables"), subject to the following provisions of this Section VIII(A) and: (a) in the case of Deliverables comprising reports with respect to the security of the Client enterprise or the information systems of Client ("Security Reports"), Section V hereof; and (b) in the case of Deliverables created pursuant to the performance, in whole or part, of RVI Services, as to which the ownership and other rights shall be governed by Annex I hereto and this Paragraph A (provided that in the event of any inconsistency, ambiguity or conflict between such Annex and this Paragraph A, such Annex shall govern).  The Deliverables exclude all third party works and products whether or not included or embedded in the Deliverables.  The Deliverables shall be deemed to be "works made for hire" under the federal copyright laws.  CGE&Y agrees to give Client reasonable assistance, at Client's expense, to perfect such assignment of such rights, title and interest.  However, the Deliverables may include data, modules, components, designs, utilities, subsets, objects, program listings, tools, models, methodologies, programs, systems, analysis frameworks, leading practices, and specifications (collectively, "Technical Elements") owned or developed by CGE&Y prior to, or independently from, its engagement hereunder (and any modifications or enhancements to CGE&Y's Technical Elements developed in the course of performing the Services) (collectively, "CGE&Y Technical Elements") and CGE&Y retains exclusive ownership rights to all CGE&Y Technical Elements.  Accordingly, to the extent that any such CGE&Y Technical Elements are integrated into any Deliverables, CGE&Y hereby grants to Client a perpetual, worldwide, non-exclusive, paid-up, limited license to use, copy and modify such CGE&Y Technical Elements as integrated into such Deliverables for internal purposes only.  Notwithstanding anything to the contrary in this Section, where CGE&Y utilizes as a subcontractor a third party software vendor to provide Services with respect to software under license to Client from such subcontractor, Client's rights to any materials developed by such subcontractor, to the extent they would constitute a Deliverable if developed by CGE&Y, shall be subject to the terms of the software license agreement between Client and such subcontractor.  Notwithstanding anything to the contrary contained herein, CGE&Y retains all rights to its knowledge, experience and know-how (including processes, ideas, concepts and techniques) acquired in the course of performing the Services, and Client hereby grants to CGE&Y a perpetual, worldwide, paid-up license to use, copy, modify and sublicense, in the course of CGE&Y's business, any Technical Elements acquired or developed hereunder.

B.      Acceptance.  If Client reasonably determines that a Deliverable fails in any material respect to meet the specifications and/or other acceptance criteria mutually agreed upon by the parties, Client shall (a) promptly, after the delivery by CGE&Y of such Deliverable, notify CGE&Y in writing of such failure, and (b) specify in reasonable detail the nature and extent of such failure.  Upon receipt of such notice, CGE&Y shall, solely through the performance of additional Services, make such adjustments, modifications or revisions as are necessary to cause such Deliverable to so meet the specifications and/or other acceptance criteria mutually agreed upon by the parties, and either: (i) in the case of a non-software Deliverable, re-submit such Deliverable to Client for Client's review; or (ii) in the case of a Deliverable that comprises software, notify Client that such Deliverable is ready for re-testing.  At such time as such a Deliverable so meets such specifications and/or other acceptance criteria, Client shall issue a writing indicating its acceptance of such Deliverable.  In any case, each such Deliverable

shall be deemed accepted unless rejected in writing within ten (10) calendar days of the delivery by CGE&Y of such Deliverable. Notwithstanding the rejection of any Deliverable by Client, operational use of such Deliverable shall be deemed to constitute acceptance thereof. Once accepted, Client may not thereafter reject any interim Deliverable, provided that acceptance of a composite Deliverable may be conditioned upon the appropriate integration and operation of such previously accepted interim Deliverable into such composite Deliverable, to the extent required by the applicable specifications or acceptance criteria. Notwithstanding the foregoing, the acceptance of Deliverables that are created, in whole or part, from the performance of RVI Services shall be governed solely by Section 5 of Annex I hereto, and the provisions of this Paragraph B shall have no force or effect with respect thereto.

IX.    Term and Termination.  This Agreement will terminate when the Services have been performed. Either party may terminate this Agreement in the event of a material breach of this Agreement by the other party (which shall include any failure by Client to make timely payment of any fees or reimbursement of expenses due under this Agreement), which breach is not cured within thirty (30) days, or such other reasonable period if the breach (other than for non-payment) cannot reasonably be cured within thirty (30) days after receipt of written notice by the breaching party. The failure to cure such breach as stated in the preceding sentence shall result in the termination of this Agreement. Client shall pay CGE&Y for all fees and expenses incurred through the effective date of termination, provided that such payment shall not affect any other rights and remedies CGE&Y may have under this Agreement. In the event that CGE&Y terminates this Agreement due to a breach by Client, CGE&Y shall also be entitled to be paid a redeployment fee in an amount equal to twenty percent (20%) of the total amount of all fees for unperformed Services that are being terminated. Any such payments shall not affect any other rights or remedies CGE&Y may have under this Agreement. The provisions of this Agreement which give the parties rights beyond termination of this Agreement will survive any termination of this Agreement, including, without limitation, Section III (Warranty and Liability), Section IV (Tools), Section V (Security Services), Section VI (Renovation, Validation and Implementation Services), Section VII (Confidentiality), Section VIII(A) (Rights to Deliverables), Section XI (Taxes and Payment), Section XIII (Non-Solicitation), Section XV (Dispute Resolution; Equitable Relief), Section XVII (Closure), Section XVIII (Governing Law), Section XIX (Publicity), Section XXI (No Third Party Beneficiaries), and if applicable, Section 7(c) of Annex III (Business Associate Agreement; Effect of Termination).

X.    Bankruptcy.  Either party may terminate this Agreement and all Letters into which this Appendix A may be incorporated, effective immediately upon giving notification thereof in the event the other party is adjudged insolvent or bankrupt, or upon the institution of any proceeding against the other party seeking relief, reorganization or arrangement under any laws relating to insolvency, or for the making of any assignment for the benefit of creditors, or upon the appointment of a receiver, liquidator or trustee of any of the other party's property or assets, or upon liquidation, dissolution or winding up of the other party's business.

XI.    Taxes and Payment.  Any applicable taxes incurred in connection with the Services and Deliverables, including any Tools provided hereunder, (except for taxes imposed on entity income) will be billed to, and paid by, Client, in addition to fees and expenses. Payment by Client of CGE&Y's fees, expenses and any applicable taxes shall be due within thirty (30) days of CGE&Y's invoice unless otherwise specified in the Letter. CGE&Y may receive from vendors credits or payments for purchases, which shall not alter or reduce Client's obligation to pay expenses as invoiced by CGE&Y and referenced above. CGE&Y may change the address to which payments are to be sent by Client at any time by giving Client written notice of such change. If any amount is not paid within thirty (30) days after it becomes due, Client shall also pay CGE&Y interest on that amount for the period from its due date until it is paid in full. That interest shall be calculated at a rate equal to twelve percent (12%) per annum (or the maximum rate permitted by applicable law, if lower), and shall be payable on demand.

XII.    Conflict.  In the event of any conflict, ambiguity or inconsistency between this Appendix A, on the one hand, and any other document to which this Appendix A may be annexed or which may be annexed to this Appendix A (other than Annex I, Annex II, Annex III, and each applicable Annex pertaining to Tools), including any terms and conditions on Client's purchase orders or otherwise, on the other hand, the terms and conditions of this Appendix A shall govern; and in the event of any conflict, ambiguity or inconsistency between this Appendix A on the one hand, and Annex I, Annex II, Annex III or an applicable Annex pertaining to Tools on the other hand, the terms and conditions in such Annexes shall govern.

XIII.   Non-Solicitation.  During the term of this Agreement and for a period of one (1) year following its termination, neither party shall, as a result of becoming aware of any employee of the other party or its subcontractors who is connected with the performance of this Agreement, directly or indirectly solicit or hire (or utilize as an independent contractor) such employee.

XIV.    Severability.  If any provision of this Agreement, or the application thereof, shall for any reason and to any extent be determined by a court of competent jurisdiction to be invalid or unenforceable, such provision shall be modified or interpreted by the court so as best to reasonably effect the intent of the parties and the parties shall replace any such invalid or unenforceable provision with valid and enforceable provision(s) that are consistent with the modification or interpretation made by the court. All other provisions of this Agreement shall remain in full force and effect.

XV.     Dispute Resolution; Equitable Relief.

        A.      The parties will attempt in good faith to resolve any controversy or claim arising out of or relating to this Agreement or the Services through discussions between the CGE&Y Vice President and the Client executive responsible for providing and accepting the Services.  If these discussions are unsuccessful, the parties agree that any action asserting a claim by one party against the other party hereto arising out of or relating to this Agreement or the Services must be brought in the state or federal court for the county or district wherein the party against which the claim is brought has its principal place of business.  Notwithstanding the foregoing, any action asserting a claim for collection of fees, expenses and/or other compensation due or owing to CGE&Y under this Agreement may be brought in a state or federal court in New York, New York, which for purposes of this Agreement, is CGE&Y's principal place of business.  If an action is pending on any claims between the parties, any claim which could be brought as a counterclaim must be brought in the pending action, if at all.  The parties further agree to waive any right to a jury trial that either party might otherwise have in any and all courts.

        B.      The parties acknowledge that the breach of Section IV (Tools), Section VII (Confidentiality), Section VIII(A) (Rights to Deliverables), Section XIII (Non-Solicitation), Section 4 of Annex I (Proprietary Rights regarding RVI Services) or Section 1 of Annex II (Confidentiality of advice and Security Reports)  by one party will give rise to irreparable injury to the other party which is not adequately compensable in damages or at law.  Accordingly, the parties agree that injunctive relief will be an appropriate remedy to prevent violation of either party's respective rights and/or obligations thereunder.  However, subject to Section III (Warranty and Liability) and any limitations in the relevant Annex(es), nothing in this Paragraph B shall limit a party's right to any other remedies in equity or at law, including the recovery of damages.

XVI.    Force Majeure.  Neither party shall be liable for failure to fulfill its obligations under this Agreement (other than a failure to pay money) if that failure is caused, directly or indirectly, by flood, communications failure, extreme weather, fire, mud slide, earthquake, or other natural calamity or act of God, interruption in water, electricity, heating or air conditioning (depending on the season), riots, civil

7

disorders, rebellions or revolutions, acts of governmental agencies, quarantines, embargoes, malicious acts of third parties, acts of terrorism, labor disputes affecting vendors or subcontractors and for which the party claiming force majeure is not responsible, or any other similar cause beyond the reasonable control of that party (each, a "Force Majeure Event").

XVII.   Closure.  No action, regardless of form, arising out of or in connection with this Agreement or the Services may be brought by either party more than one (1) year after the cause of action accrued, provided that this Section shall not serve to preclude or limit any claim that CGE&Y may have after said period for payment by Client for Services performed hereunder.

XVIII.   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its choice of law principles.

XIX.   Publicity.  Notwithstanding anything to the contrary in this Agreement, Client hereby authorizes CGE&Y to make public reference to Client's selection of the CGE&Y service line(s) and the nature of the Services provided. Subject to Client's prior written consent, CGE&Y may publicly refer to the solution implemented or to be implemented by CGE&Y and may write and publish a high-level profile discussing the reasons supporting Client's choice of the CGE&Y solution and the benefits gained by Client. Moreover, CGE&Y may, from time to time, request Client's assistance in complying with the process employed by CGE&Y to measure client satisfaction, as may be stated in the Letter.

XX.   Assignment.  Neither this Agreement nor any of the rights or duties hereunder may be assigned or otherwise transferred by either party without the other party's prior written consent; provided, however, that CGE&Y may assign or otherwise transfer its rights or duties under this Agreement to another member of the Cap Gemini S.A. group. Any act which is inconsistent with the terms of this Section shall be null and void *ab initio*.

XXI.   No Third Party Beneficiaries.  This Agreement is entered solely by and between, and may be enforced only by, CGE&Y and Client. Except as set forth in Sections IV, V and VI (including each applicable Annex pertaining to Tools, Annex I and Annex II, respectively) and Section III(H), this Agreement shall not be deemed to create any rights in or obligations to any third parties.

8

## ANNEX I

## ADDITIONAL TERMS AND CONDITIONS FOR
## RENOVATION, VALIDATION AND IMPLEMENTATION SERVICES

1.    **Definitions**

Except as otherwise expressly defined in the Letter or the Appendix A to which this Annex I is attached, the following are the definitions of the capitalized terms used in this Annex I.

"Actual Test Results" is defined in Section 5.1 of this Annex I.

"Approval Notice" is defined in Section 5.1. of this Annex I

"Baseline Test Results" is defined in Section 5.1 of this Annex I.

"Client Applications" means the computer software (whether owned by Client or licensed from third parties) used by Client in its information systems, which CGE&Y and the Client select for renovation, validation and/or implementation by CGE&Y hereunder.

"Client Facilities" means the space and equipment (whether owned by Client or made available by third parties), including, without limitation, the space and equipment located at _____, that Client shall provide use of to CGE&Y from time to time, as reasonably may be necessary in connection with the performance of the RVI Services hereunder.

"Renovation Group" means, with respect to Client Applications, a group of programs, data and processes that will be renovated, validated and/or implemented together hereunder.

"Renovation Test Suite" is defined in Section 5.1 of this Annex I.

"Third Party Licenses" means the licenses granted to Client for use of third party software as part of the Client Applications.

"Work Plan" means the written plan setting forth the renovation and validation strategy, the grouping of applicable Client Applications into Renovation Groups, the test plans, and the processing requirements expected to be met by each Renovation Group and the implementation plan therefor. In accordance with the schedule set forth in the Letter, the Work Plan shall be mutually agreed upon by the parties and incorporated herein.

2.    **Location of Services**

Client acknowledges and agrees that the RVI Services may be performed by CGE&Y or any of its subcontractors at Client Facilities or such other locations as may be desirable from time to time in CGE&Y's sole discretion.

3.    **Certain Rights and Obligations with Respect to Client Applications**

3.1    Licenses. Client shall provide to CGE&Y, at no charge to CGE&Y, unrestricted rights and licenses (including, if necessary, sublicenses under Third Party Licenses) to all the Client

I-1

Applications that are necessary or desirable to permit CGE&Y to provide the RVI Services as contemplated herein.

3.2     Indemnity. Client shall indemnify, defend and hold harmless CGE&Y and the other CGE&Y Entities and their respective subcontractors and the members, partners, officers, directors, agents, consultants and employees of the foregoing ("CGE&Y Indemnitees") from and against (i) all third party claims and causes of action of any kind, including contract, tort or otherwise, related to or arising out of the failure of Client to comply with Section 3.1 of this Annex I, and (ii) any losses, liabilities, damages and expenses (including, but not limited to, reasonable attorneys' fees and expenses incurred by the CGE&Y Indemnitees in any such action or proceeding between an CGE&Y Indemnitee and any third party or otherwise) that are incurred by the CGE&Y Indemnitees as a result of any such claims or causes of action ("Indemnified Costs"). Client shall reimburse the CGE&Y Indemnitees for such Indemnified Costs as they are incurred by the CGE&Y Indemnitees.

4.      **Proprietary Rights**

4.1     Data and Reports. All data or information supplied by Client to CGE&Y to be used in connection with the RVI Services shall remain the property of Client or its licensors. All reports prepared specifically for Client hereunder utilizing such data or information or concerning Client's systems or applications shall be the property of Client. Upon full payment, CGE&Y shall assign to Client any and all right, title and interest, including, without limitation, copyrights, trade secrets, and other proprietary rights to such reports. CGE&Y agrees to give Client reasonable assistance and to execute any documents reasonably required, at Client's expense, to perfect such assignment. However, notwithstanding the foregoing, CGE&Y may use internally data, information and reports that CGE&Y retains in support of its Services, subject to its obligations set forth in Section VII of Appendix A. In addition, CGE&Y retains all rights in data, designs, models, methodologies, analysis frameworks, leading practices, specifications and other elements of the reports (collectively, "Technical Elements") that are owned, developed or used by CGE&Y prior to, or independently from, this engagement (and any enhancements and/or other modifications to such Technical Elements developed in the course of the performance of the RVI Services) (collectively, "CGE&Y Technical Elements"). To the extent that any CGE&Y Technical Elements are integrated into any of the reports and/or Renovation Groups, CGE&Y hereby grants to Client a perpetual, worldwide, paid-up license to use, copy and modify such CGE&Y Technical Elements as integrated into such reports and/or Renovation Groups for Client's internal purposes only. Conversely, Client grants to CGE&Y a perpetual, worldwide, paid-up license to use, copy, modify and sublicense any data or information developed by CGE&Y hereunder and included in such reports and/or Renovation Groups in the course of providing services to other clients, so long as such use would not disclose Client's confidential information or inherently disclose Client's identity.

4.2     CGE&Y and Third Parties' Proprietary Property. CGE&Y and the other CGE&Y Entities and their respective vendors and subcontractors (with respect to proprietary property provided by such vendors or subcontractors) will have and retain all right, title and interest, including ownership of copyrights, patents, trade secrets and other intellectual property rights in and to all tools, methodologies or other intellectual property (including the Technical Elements and intellectual property embodied in software) that is supplied or used by CGE&Y or such third parties in the performance of the RVI Services, including any enhancements and/or other modifications thereof developed in the course of the performance of the RVI Services. CGE&Y and the other CGE&Y Entities and their respective subcontractors retain the right to use their knowledge, experience, and know-how, including processes, ideas, concepts and techniques developed in the course of performing the RVI Services hereunder, in the course of providing consulting services to other clients.

I-2

5.    **Renovation Group Validation**

5.1    <u>Renovation Test Results</u>. In accordance with the applicable Work Plan, CGE&Y and Client shall develop and agree upon tests to be used to determine whether each of the Renovation Groups to which such Work Plan applies meets the requirements specified in such Work Plan (the "Renovation Test Suite"), and the results of such tests that shall demonstrate whether the applicable Renovation Groups so meet such requirements (the "Baseline Test Results"). Each Work Plan shall also set forth the duration of the initial testing period for each Renovation Group (the "Initial Test Period"). Within the Initial Test Period after completion of the renovation of a Renovation Group, Client shall perform the tests included in the Renovation Test Suite with respect to such Renovation Group, document the results of such tests in reasonable detail (the "Actual Test Results") and provide to CGE&Y the Actual Test Results in writing. If the Actual Test Results are consistent in all material respects with the Baseline Test Results, Client shall issue to CGE&Y, by the end of the Initial Test Period, a written notice of approval in the form of Attachment I hereto (the "Approval Notice") with respect to the applicable Renovation Group. If the Actual Tests Results fail in any material respect to be consistent with the Baseline Test Results, the Client shall identify the material inconsistencies ("Identified Inconsistencies") in reasonable detail in a written notice to CGE&Y within the time period set forth in the Letter or, if no such time period is so set forth, within ten (10) days after the completion of the Initial Test Period, and CGE&Y shall provide further RVI Services with respect to the applicable Renovation Group pursuant to the terms of this Agreement. At the conclusion of the further RVI Services, CGE&Y shall redeliver the applicable Renovation Group to Client for re-performance of the Renovation Test Suite for the applicable Renovation Group with respect to such Identified Inconsistencies. After redelivery of the applicable Renovation Group, Client will then have five (5) business days, or such other period as may be agreed upon by the parties in writing, in which to re-perform the Renovation Test Suite with respect to the Identified Inconsistencies (the "Re-Test Period") and to issue an Approval Notice or a written notice of any remaining Identified Inconsistencies. Any remaining Identified Inconsistencies will be addressed in the same manner as indicated above.

5.2    <u>Failure To Conduct Test</u>. If Client fails to provide to CGE&Y the Actual Test Results in writing within the applicable Initial Test Period or any Re-Test Period described in this Section 5, Client shall be deemed to have approved the applicable Renovation Group and to have provided to CGE&Y an Approval Notice for such Renovation Group.

5.3    <u>Exclusions</u>. The obligations of CGE&Y under this Agreement shall not be applicable with respect to any abnormal operation, impairment or calculation that is caused by (i) the quality of the data sought to be processed with the Client Application, (ii) the subsequent modification of any Client Application (other than by CGE&Y, another CGE&Y Entity and/or any of their respective subcontractors pursuant to this Annex I), or (iii) the use of the Client Application in a manner inconsistent with the way it has been historically used by Client or as otherwise provided in the Work Plan.

5.4    <u>Scope of Obligations</u>. CGE&Y shall have no further obligation or liability whatsoever with respect to any Renovation Group after an Approval Notice for such Renovation Group has been, or is deemed to have been, issued or the Client implements such Renovation Group in its production environment.

6.  **Additional Warranty Disclaimer**

CGE&Y MAKES NO WARRANTY WHATSOEVER, WHETHER EXPRESS OR IMPLIED, THAT THE CLIENT APPLICATIONS, WHEN RENOVATED, VALIDATED AND/OR IMPLEMENTED, WILL BE HIPAA COMPLIANT OR WILL OPERATE UNINTERRUPTED OR ERROR FREE, OR THAT THE RENOVATION BY CLIENT OR OTHER THIRD PARTIES OF ANY COMPUTER APPLICATION, SOFTWARE, HARDWARE, OR EQUIPMENT WILL BE HIPAA COMPLIANT OR WILL OPERATE UNINTERRUPTED OR ERROR FREE.

1-4

## ATTACHMENT I TO ANNEX I

## APPROVAL NOTICE

Date:

**To:**   **Cap Gemini Ernst & Young U.S. LLC**

[Client] approves the [designated Renovation Group], as renovated by Cap Gemini Ernst & Young U.S. LLC. [Client] acknowledges that CGE&Y has no further obligation or liability with respect to such Renovation Group.

[Client]

By:   _____

Name:   _____

IAI-1

# ANNEX II

## ADDITIONAL TERMS AND CONDITIONS
## FOR SECURITY SERVICES

1.       If the Services include any Security Risk Services, any advice and/or Security Reports are intended solely for the information and use of the Client's management, officers, directors and employees and, if applicable, also may be provided to the additional users identified on Attachment I hereto and may not be disclosed to any other third party without CGE&Y's prior written consent.

2.       If the Services include Security Testing Services, Client shall obtain all necessary consents of third party service and/or product providers of Client to such Security Testing Services.  If the Security Testing Services will be performed with respect to any information systems, applications or components that are hosted by any third party such as an internet service provider or application service provider, then the consent shall be in the form of Attachment II attached hereto.  Client understands that Security Testing Services may result in disruptions of and/or damage to Client's or third party's information systems and the information and data contained therein, including but not limited to denial of access to a legitimate system user, automatic shut-down of information systems caused by intrusion detection software or hardware, or failure of the information system.  Client is solely responsible for understanding the testing steps that will be performed as part of the Security Testing Services and for arranging alternative means of operation should such disruptions or failures occur and for all damage caused by the Security Testing Services.

3.       Neither CGE&Y nor any other CGE&Y Entities or any of their respective subcontractors or the members, directors, officers, employees, agents or advisors of any of the foregoing shall have any responsibility or liability for, and Client shall have no recourse against any of the foregoing for, any damages as a result of (i) any Security Services or (ii) the disclosure of any Security Report or information therein (including any portion, abstract or summary of the Security Report) to any unauthorized third party, whether orally or in writing ("Unauthorized Disclosure"), including with respect to any third party claim against Client related to or arising out of any Security Services or Unauthorized Disclosure.

4.       Client shall indemnify and hold harmless CGE&Y and the other CGE&Y Entities and their respective subcontractors and the members, officers, directors, agents, advisors and employees of the foregoing ("Indemnitees") from and against (i) all claims and causes of action of any kind, including contract, tort or otherwise, by any third party related to or arising out of any Unauthorized Disclosure or Security Services provided hereunder, and (ii) any losses, liabilities, damages and expenses (including, but not limited to, reasonable attorneys' fees) that are incurred by the Indemnitees as a result of any such claims or causes of action.  Client's subsidiaries and affiliates are deemed a third party as that term is used in this Section.

II-1

ATTACHMENT I TO ANNEX II

ADDITIONAL USERS

ATTACHMENT II TO ANNEX II

**Consent For Third Party Hosting Client's Information Systems**

[Date]

[Names and Address of Third Party Host]

Dear [Name of Third Party Host Official]

This letter is to confirm that [*insert name of client*] ("Company") has requested Cap Gemini Ernst & Young U.S. LLC ("CGE&Y") to perform services that may include discovery/scanning, exploitation, penetration, vulnerability assessment, intrusion testing or related analysis of Company's information systems or enterprise whether by using intrusive or passive techniques and/or software tools or otherwise ("Security Testing Services"). Certain of Company's information systems or enterprise is hosted by [*insert name of Third Party Host* ] ("Provider"). Provider understands that Security Testing Services may result in disruptions of and/or damage to Provider's information systems and the information and data contained therein, including, but not limited to, denial of access to a legitimate system user, automatic shut-down of information systems caused by intrusion detection software or hardware, or failure of the information system. Provider consents to the performance of the Security Testing Services by CGE&Y. Provider agrees that it has no recourse against either CGE&Y or any subcontractor thereof for any unintended consequences that may result from the Security Testing Services. Provider further agrees that CGE&Y shall be a third party beneficiary of this letter and may enforce its terms.

Please confirm your agreement with this letter by signing and dating a copy of this letter and returning it to [*Insert name and address of appropriate client person*] with a copy to [*Insert name and address of appropriate CGE&Y person*].

Very truly yours,

*[Insert Name of Client]*

Accepted by:

*[Insert Name of Third Party Host]*

By: _____
Title: _____
Date: _____

IIAII-1

## ANNEX III

## BUSINESS ASSOCIATE AGREEMENT

**1.    Definitions**

Terms used, but not otherwise defined, in this Annex shall have the same meaning as those terms in the Privacy Rule.

(a)    Business Associate. "Business Associate" shall mean CGE&Y.

(b)    Business Associate Agreement.    "Business Associate Agreement" shall mean the Business Associate Agreement set forth in this Annex.

(c)    Covered Entity. "Covered Entity" shall mean Client.

(d)    Individual. "Individual" shall have the same meaning as the term "individual" in 45 CFR 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR 164.502(g).

(e)    Privacy Rule. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 160 and Part 164, Subparts A and E.

(f)    Protected Health Information. "Protected Health Information" shall have the same meaning as the term "protected health information" in 45 CFR 160.103, limited to the information created or received by Business Associate from or on behalf of Covered Entity.

(g)    Required By Law. "Required By Law" shall have the same meaning as the term "required by law" in 45 CFR 160.103.

(h)    Secretary. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

**2.    Obligations and Activities of Business Associate**

(a)    Business Associate agrees to not use or disclose Protected Health Information other than as permitted or required by this Business Associate Agreement or as Required By Law.

(b)    The terms of this Business Associate Agreement provide satisfactory assurances that Business Associate will appropriately safeguard the use or disclosure of Protected Health Information Business Associate receives from Covered Entity or creates on behalf of Covered Entity.

(c)    Business Associate agrees to report to Covered Entity any use or disclosure of the Protected Health Information not provided for by this Business Associate Agreement of which it becomes aware.

(d)    Business Associate agrees that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Business Associate

on behalf of Covered Entity, agrees to the same restrictions and conditions with respect to such information that apply through this Business Associate Agreement to Business Associate.

(e)    To the extent the Business Associate has Protected Health Information in a Designated Record Set, Business Associate agrees to provide access, at the request of Covered Entity, and upon reasonable prior written notice, to Protected Health Information in a Designated Record Set, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under 45 CFR 164.524.

(f)    To the extent the Business Associate has Protected Health Information in a Designated Record Set, Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that the Covered Entity directs or agrees to pursuant to 45 CFR 164.526 at the request of Covered Entity or an Individual, and upon reasonable prior written notice.

(g)    Business Associate agrees to make internal practices, books, and records, including policies and procedures and Protected Health Information, relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of, Covered Entity available to the Covered Entity, or to the Secretary, upon reasonable prior written notice or designated by the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

(h)    Business Associate agrees to document such disclosures of Protected Health Information and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

(i)    Business Associate agrees to provide to Covered Entity or an Individual, upon reasonable prior written notice, information collected in accordance with Section 2(h) of this Business Associate Agreement, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

**3.    Permitted Uses and Disclosures by Business Associate**

Except as otherwise limited in this Business Associate Agreement, Business Associate may use or disclose Protected Health Information to perform functions, activities, or Services for, or on behalf of, Covered Entity as specified in the Agreement and as further set forth in Section 4 of this Business Associate Agreement.

**4.    Specific Use and Disclosure Provisions**

(a)    Except as otherwise limited in this Business Associate Agreement, Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

(b)    Except as otherwise limited in this Business Associate Agreement, Business Associate may disclose Protected Health Information for the proper management and administration

of the Business Associate, provided that disclosures are Required By Law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

(c) Except as otherwise limited in this Business Associate Agreement, Business Associate may use Protected Health Information to provide Data Aggregation services to Covered Entity as permitted by 45 CFR 164.504(e)(2)(i)(B).

(d) Business Associate may use Protected Health Information to report violations of law to appropriate Federal and State authorities, consistent with 45 CFR 164.502(j)(1).

5. **Obligations of Covered Entity**

(a) Covered Entity has determined that the Services to be performed under the Agreement constitute treatment, payment or health care operations, as defined in 45 CFR 164.501.

(b) Covered Entity shall provide the appropriate Individuals with adequate notice of its privacy practices, in accordance with CFR 164.520, and of the uses and disclosures of Protected Health Information, including the use and disclosure of Protected Health Information to Business Associate, and shall obtain any required consents or authorizations necessary for the disclosure of Protected Health Information to Business Associate.

(c) Covered Entity shall notify Business Associate of any limitation(s) in its notice of privacy practices of Covered Entity in accordance with 45 CFR 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of Protected Health Information.

(d) Covered Entity shall notify Business Associate of any changes in, or revocation of, permission by Individual to use or disclose Protected Health Information, to the extent that such changes may affect Business Associate's use or disclosure of Protected Health Information.

(e) Covered Entity shall notify Business Associate of any restriction to the use or disclosure of Protected Health Information that Covered Entity has agreed to in accordance with 45 CFR 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of Protected Health Information.

6. **Permissible Requests by Covered Entity**

Covered Entity shall not request Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy Rule if done by Covered Entity, except to the extent the Business Associate will use or disclose Protected Health Information for Data Aggregation on behalf of the Covered Entity or management and administrative activities of the Business Associate.

7. **Term and Termination**

    (a)   <u>Term</u>. This Business Associate Agreement shall terminate when all of the Protected Health Information provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity. If it is infeasible for Business Associate to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section.

    (b)   <u>Termination for Cause</u>. Upon either party's knowledge of a material breach by the other party, the non-breaching party shall either:

        (1)   Provide written notice of such material breach and a thirty (30) day period for the breaching party to cure such breach or end the violation and terminate the Agreement if the breaching party does not cure the breach or end the violation within such period;

        (2)   Immediately terminate the Agreement if the breaching party has breached a material term of this Business Associate Agreement and cure is not possible; or

        (3)   If neither termination nor cure is feasible and in the case of a breach by Business Associate, Covered Entity shall report the violation to the Secretary.

    (c)   <u>Effect of Termination</u>.

        (1)   Except as provided in paragraph (2) of this section, upon termination of this Business Associate Agreement, for any reason, Business Associate shall return or destroy all Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the Protected Health Information.

        (2)   In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon Business Associate's determination that return or destruction of Protected Health Information is infeasible, Business Associate shall extend the protections of this Business Associate Agreement to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information.

8. **Miscellaneous**

    (a)   <u>Regulatory References</u>. A reference in this Business Associate Agreement to a section in the Privacy Rule means the section as in effect or as amended.

    (b)   <u>Amendment</u>. The Parties agree to take such action as is necessary to amend this Business Associate Agreement from time to time as is necessary for Covered Entity to comply

with the requirements of the Privacy Rule and the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191.

(c)    <u>Survival</u>. The respective rights and obligations of Business Associate under Section 7(c) of this Business Associate Agreement shall survive the termination of this Business Associate Agreement.

(d)    <u>Interpretation</u>.  Any ambiguity in this Business Associate Agreement shall be resolved to permit Covered Entity to comply with the Privacy Rule