Exhibit B



555 California Street
Suite 1800
San Francisco, CA 94104

(415) 951-3200
www.us.cgey.com/health

**Cap Gemini Ernst & Young** Health

December 19, 2002

Ms. Leesa Tori
Director
PacAdvantage
221 Main Street, Suite 1500
San Francisco, CA 94105

Re:  PX2 Implementation Management

Dear Ms. Tori:

We appreciate the opportunity to be of service to PacAdvantage in the provision of software implementation management services. Pacific Health Advantage (PacAdvantage) is a subsidiary of the Pacific Business Group on Health and is the former Health Insurance Pool of California. PacAdvantage contracts with quality medical, dental, vision and chiropractic insurance plans to offer health insurance coverage to small businesses. PacAdvantage is currently offered to 15,000 small businesses and approximately 140,000 employees and dependents.

## Our Understanding

PacAdvantage has contracted with Benefit Partners, Inc. (BPI) of Roseville, CA, a third party administer, to provide insurance enrollment and eligibility services for the PacAdvantage insurance program. For more than the last 14 months, BPI has been working with outsourced information technology management and software vendors on the implementation of a new software application to carry out their enrollment, finance / premium billing and payment, and sales functions. This includes migrating from the existing client server architecture enrollment application system to an n-tier architecture using Java based applications. Phoenix, the existing custom system is Pick operating system based and was written by Visual World. BPI contracted with Mascon Global Limited to develop PX2, a new n-tier architecture Java based custom application using IBM Websphere and DB2.

BPI also contacted with R Systems, Inc (RSI) of El Dorado Hills, CA to manage their information technology needs, including network and database administration, website management, help desk services, e-mail services, file, print and backup services in addition to the voice and data infrastructure.

The implementation of PX2 is more than two months behind schedule. PX2 was scheduled to be operational by October 9, 2002. The contract with Visual World for the Phoenix application

**CAP GEMINI ERNST & YOUNG**

December 19, 2002

Ms. Leesa Tori

Page 2

was terminated effective December 1, 2002 in anticipation of the successful implementation of a new custom written enrollment application. There are significant applications and technical problems with the implementation of PX2, e.g., inability to load new enrollment, record locking. PacAdvantage is under contract to enroll approximately 10,000 new members in December and significantly more members in January.

Both Mascon and RSI have provided additional staff to attempt to resolve the implementation issues. The teams are working 7-day weeks around the clock to attempt to resolve the problems. PacAdvantage is concerned PX2 will not be operational in a reasonable time and requests consulting assistance to analyze the situation, recommend a direction and manage the implementation teams to resolve the issues. Specifically, PacAdvantage has requested assistance with:

- Ongoing project management of health care enrollment and financial software application implementation
- Scope management
- Communications management
- Continuous gap analysis
- Coordination across all parties (BPI, Mascon, RSI)
- Conflict resolution
- Creative problem solving
- Facilitation
- Leadership

We understand PX2 is a mission critical application for BPI and PacAdvantage. PacAdvantage would like the PX2 application to be functional as quickly as possible. At the same time, you recognize it is a difficult process to identify and resolve the open issues due to the complexities of custom software development and implementation. The multiple parties and off-shore development involved in the design and implementation effort further complicate this situation.

On December 19, 2002, you decided to continue using the Phoenix application for December business and develop a work around to enable Phoenix to be used for new rating schemes effective in January.

This letter addresses the scope, duration and staffing for this effort.

**Project Scope and Approach**

PacAdvantage has requested immediate assistance to scope the PX2 implementation issues, recommend a course of action and provide project management to lead BPI, Mascon and RSI to resolve the issues. Our initial assessment efforts will focus on:

- Understand the current state of the application including software and hardware architecture and open incidents

**CAP GEMINI
ERNST & YOUNG**

December 19, 2002

Ms. Leesa Tori

Page 3

- Understand the perspective of each of the parties regarding implementation issue resolution
- Review application specifications
- Review testing protocols and use cases
- Review user training procedures
- Review data conversion procedures
- Review software and hardware configuration
- Identify and direct the team to implement short term issue resolution strategies
- Facilitate the cooperation and communication between BPI, Mascon and RSI resources

Following our initial assessment, we will develop and review with you the longer-term remediation strategy to identify and resolve open issues related to the use of the PX2 application. Possible courses of action may include

- Detailed application requirements review
- Application software modifications
- Additional unit and/or integration and regression testing
- System software configuration changes
- Hardware configuration changes
- Additional training
- Recommendation of on-going vendor participation levels
- Recommendation of contingency strategies to be used until the PX2 application can be made available for use.

We will provide resources to manage the BPI, Mascon and RSI team to execute the longer-term strategy.

Ira Rothman will begin the initial assessment activities on January 2, 2003. Based on the first day activities, he will determine if the assistance of an additional consultant is required to complete the assessment. The initial assessment is estimated to require up to 5 days to complete.

Following the initial assessment, we will discuss the staffing level and estimated duration of the remediation management activities. We expect to assign a Project Manager and Project Management Consultant on a full time basis to perform this effort. Ira Rothman will provide periodic advice and oversight, as needed, e.g., 4 – 8 hours per week.

## Assumptions

1. BPI, Mascon and RSI resources will work together to resolve open issues.
2. The assigned resources will work a time schedule that will provide maximum focus on resolving open issues including 10 to 16 hour days, as required.
3. Mascon and RSI will take responsibility for application and hardware modifications.

**CAP GEMINI**
**ERNST & YOUNG**

December 19, 2002

Ms. Leesa Tori

Page 4

4.  A private office will be provided to our Project Manager so that he can conduct meetings as required. This office will have at least one speakerphone for conference calls and an analog phone line or Internet connection to permit access to the CGE&Y network. Access will also be provided to a network or stand-alone printer for our laptop.

## Proposed Project Team

For this project, we propose the following staffing. These individuals are representative of the skills and experience of the staff we expect to assign to this project. However, depending on exact timing of this project, the specific individuals below may not be the actual project team, but represent the experience and qualifications of comparable staff.

**Ira Rothman**, Principal, will serve as Engagement Executive. In this role, Ira will be involved in structuring and reviewing key deliverables, will participate in key meetings, and will have overall responsibility for supervising CGE&Y's work on this engagement.

**Scott Whyte** and **Haissam Issa** will provide Technical Support as necessary. This will be primarily on a remote basis.

A CGE&Y consultant, name to be determined, will serve as Project Manager. The Project Manager will provide day-to-day leadership to the project team during the remediation activties.

Project Management Consultant, name to be determined, will provide detail project management and tracking support. This consultant will assist the Project Manager to plan and track the detail progress required to implement the PX2 remediation strategy. The consultant will also assist with the generation of weekly management status reports.

CGE&Y will draw upon other subject matter specialists on an "as needed" basis throughout the project duration.

## Timing and Fees

Due to the high variability of the scope and work effort, we have estimated our fees on an hourly basis plus out-of-pocket expenses, e.g., travel, lodging, communications. Our fees for this assignment are as follows:

- Ira Rothman              $445 / hour
- Project Manager          $300 - 425 / hour
- Project Management       $185 - 225 / hour
- Haissam Issa             $305 / hour
- Scott Whyte              $425 / hour

**CAP GEMINI**
**ERNST & YOUNG**

December 19, 2002

Ms. Leesa Tori

Page 5

Based on our discussion, we would expect to work between 10 and 12 hours per day on this assignment on a 5-day week basis with periodic peaks in this effort level based on project deadlines. Based on our assessment, we will jointly determine the mix of staff going forward. We will provide you with weekly status reports and hours expended by resource.

As the engagement progresses, we may find that additional tasks need to be performed that are beyond the scope of the tasks described in this letter or that additional effort beyond what was originally anticipated will be needed. For example, if the information that is provided to us is incomplete or inaccurate, if we don't receive the assistance we are anticipating, the scope and/or timing of our services may change from that described in this letter. While we are pleased to provide additional value-added assistance, we will discuss any changes in the tasks or our services, including any out-of-scope items, with you to obtain your approval prior to proceeding.

In addition to our professional fees, we will bill for direct expenses incurred on behalf of PacAdvantage, including travel, communication, report production, delivery charges and other out-of-pocket expenses. We propose to bill PacAdvantage for the first week estimated effort (i.e., Ira Rothman at 50 hours or $22,250) at the initiation of this project and will expect payment within 10 days of the date of the invoice. We will bill you on a bi-weekly basis for our services and expect payment within 10 days of our invoice.

* * * * * * * *

**CAP GEMINI**
**ERNST & YOUNG**

December 19, 2002

Ms. Leesa Tori

Page 6

We appreciate the opportunity to submit this letter and look forward to working with PacAdvantage on this important initiative. Should you have any questions, ideas or concerns regarding this document, I am certain we can further tailor our approach to meet your needs. Please contact Ira Rothman at (415) 951-3217 (office) or (916) 508-0988 (cell) with any questions you may have regarding this material. To authorize CGE&Y to begin work on this engagement on the basis of the work plan and investment described herein, please sign and return one copy of this letter.

Sincerely,

Ira Rothman, Principal
Cap Gemini Ernst & Young
Health Consulting

If any portion of this letter is held to be void, invalid or otherwise unenforceable, in whole or part, the remaining portion of this letter shall remain in effect.

Agreed to and accepted for **PacAdvantage** by:

_____
Name and Title

_____
Date

Attachments
　　Appendix A    CGE&Y Terms and Conditions



December 18, 2002

Ms. Leesa Tori

Page 6

We appreciate the opportunity to submit this letter and look forward to working with PacAdvantage on this important initiative. Should you have any questions, ideas or concerns regarding this document, I am certain we can further tailor our approach to meet your needs. Please contact Ira Rothman at (415) 951-3217 (office) or (916) 508-0988 (cell) with any questions you may have regarding this material. To authorize CGE&Y to begin work on this engagement on the basis of the work plan and investment described herein, please sign and return one copy of this letter.

Sincerely,

Ira Rothman, Principal
Cap Gemini Ernst & Young
Health Consulting

If any portion of this letter is held to be void, invalid or otherwise unenforceable, in whole or part, the remaining portion of this letter shall remain in effect.

Agreed to and accepted for PacAdvantage by:

Leesa Tori Director
Name and Title

12-20-02
Date

Attachments
    Appendix A    CGE&Y Terms and Conditions

APPENDIX A

## TERMS AND CONDITIONS
## FOR HIPAA-RELATED SERVICES

I.    Services. It is agreed that Cap Gemini Ernst & Young U.S. LLC ("CGE&Y") will provide consulting services (the "Services") in connection with certain regulations promulgated by the U.S. Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), which Services are described in the accompanying Letter of Understanding to which this Appendix A is attached (such accompanying Letter of Understanding, the "Letter"; the Letter and this Appendix A and all attachments hereto, collectively, this "Agreement"), to the client named in this Agreement ("Client"), as an independent contractor, provided that Client pays, in a timely manner, all of the fees and expenses set forth in this Agreement. This Agreement constitutes the entire and sole agreement between Client and CGE&Y and merges all prior and contemporaneous communications with respect to the subject matter hereof. This Agreement shall not be amended or otherwise modified, except by a later written agreement that expressly states that it is such an amendment or modification and that is signed by both parties. Except as set forth in such amendment or modification, no provision or statement in any document delivered in connection with this Agreement shall impose any additional obligation on CGE&Y. Nothing contained herein shall be construed to create an employment or principal-agent relationship, or a partnership or joint venture, between CGE&Y and Client, and neither party shall have the right, power or authority to obligate or bind the other in any manner whatsoever.

II.    Changes and Delays.

    A.    Changes.

        1.    The parties acknowledge and agree that the occurrence of the following events (each, an "Adjustment Event") may require an extension in the schedule and/or an increase in the fees and expenses and/or an increase in the work CGE&Y is to perform: (a) a material change to or deficiency in the information which Client has supplied to CGE&Y; (b) a failure by Client and/or vendors to perform any of their respective responsibilities under this Agreement in a timely manner, including, without limitation, the supply to CGE&Y of adequate resources and information; (c) an unanticipated event that materially changes the service needs or requirements of Client; (d) circumstances beyond the reasonable control of either of the parties, including actual or potential year 2000 defects, acts of God or other Force Majeure Events (as defined herein); (e) a change in law; or (f) any assumption in the Letter not being fully realized.

        2.    The parties also agree that from time to time during the term of this Agreement, Client may request, or CGE&Y may propose, that CGE&Y implement a change to the Services which may require an extension in the schedule and/or an increase in the fees and expenses and/or an increase in the work CGE&Y is to perform (each, a "Change"), including: (a) a change to the scope or functionality of the Deliverables (as defined herein); (b) a change in the prioritization or manner in which CGE&Y is performing the Services; or (c) a change to the scope of the Services.

        3.    In the event an Adjustment Event occurs or the parties agree on a Change, CGE&Y may prepare and provide to Client a proposed change order identifying the impact and setting forth any applicable adjustments in the schedule and/or payments to CGE&Y. An authorized representative of each party shall promptly sign each such proposed change order to acknowledge the impact and to indicate that party's agreement to the adjustments. In the event the parties' respective authorized representatives reach agreement, the agreed upon adjustments shall constitute Services. In the

Appendix A-1

event that the parties' respective authorized representatives disagree in this regard, they shall promptly negotiate the same in good faith. If they are unable to reach an agreement, they shall refer that matter to the parties' respective executive management representatives, who will meet or confer by telephone conference as promptly as practical and in any event within ten (10) business days to negotiate the same in good faith in an attempt to reach an agreement. If the parties fail to reach an agreement, CGE&Y shall not be obligated to perform any additional or modified Services and either party shall be free to pursue alternative remedies.

B.      Delays. Notwithstanding Paragraph A of this Section II, if any delays or deficiencies in the Services or Deliverables occur as a result of Adjustment Events or Changes, the scheduled completion date for the affected Services and Deliverables shall be extended to the extent of any such delays and CGE&Y shall not incur any liability to Client as a result of such delays or deficiencies. If such delays last for an aggregate of thirty (30) days or more, CGE&Y shall be entitled to terminate this Agreement by giving written notice to Client, such termination to be effective on the date indicated in said notice.

III.    Warranty and Liability.

A.      CGE&Y warrants that it will exercise due professional care and competence in the performance of the Services. CGE&Y will, to the extent applicable to the Services described in the Letter, take into consideration the requirements of compliance with the Standards for Electronic Transaction and Code Sets published on August 17, 2000, 65 Fed. Reg. 50312, the Standards for Privacy of Individually Identifiable Health Information published on December 28, 2000 and made final on April 14, 2001, 65 Fed. Reg. 82798, and the draft proposed Security and Electronic Signature Standards published on August 12, 1998, 63 Fed. Reg. 43242 (collectively, the "HIPAA Regulations"). Some of the HIPAA Regulations remain in draft form and there has been no comprehensive, formal interpretation of the formal and draft regulations. Accordingly, CGE&Y expressly disclaims any further warranty with regard to HIPAA, the HIPAA Regulations or any other regulations promulgated thereunder.

B.      CGE&Y warrants that any computer software that (i) is produced exclusively by CGE&Y hereunder with software tools selected entirely by CGE&Y, and (ii) processes dates as a material part of its function, is designed to correctly operate with dates occurring on and after January 1, 2000, provided that any and all dates that are entered into or otherwise supplied for processing by such software are unambiguous as to date, in the correct format and otherwise accurate. Except as provided in this Paragraph, CGE&Y shall have no liability for any defect or problem arising out of or related to date processing in any of Client's systems.

C.      Any claim for breach of the warranties in this Section III with respect to any of the Services must be made by written notice to CGE&Y within sixty (60) days of performance of such Services. For any breach of the warranties in this Section III, Client's exclusive remedy, and CGE&Y's entire liability, shall be the re-performance of such Services. If CGE&Y does not re-perform the Services as warranted under this Section III, Client shall be entitled to recover the fees paid to CGE&Y for such deficient Services.

D.      To the fullest extent permitted by applicable law, the total aggregate liability of CGE&Y, regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, under this Agreement or with respect to the Services shall be limited to the fees paid to and retained by CGE&Y under this Agreement. If CGE&Y is working on a multi-phase engagement for Client, the total aggregate liability of CGE&Y shall be limited to the fees paid to and retained by CGE&Y for that particular phase that principally gives rise to the liability.

E.    In no event will CGE&Y or Client be liable for consequential, incidental, indirect, punitive or special damages (including loss of profits, data, business or goodwill), regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages.

F.    CLIENT UNDERSTANDS THAT CGE&Y IS PERFORMING THE SERVICES HEREUNDER IN RELATION TO SYSTEMS AND DATA THAT HAVE BEEN PRODUCED BY CLIENT, OR SUPPLIED TO CLIENT BY THIRD PARTIES, AND FOR ALL OF WHICH CGE&Y HAS NO RESPONSIBILITY. EXCEPT AS OTHERWISE STATED IN THIS SECTION III, CGE&Y MAKES NO WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, OR WARRANTIES OF ANY PRODUCTS OR SERVICES, OR THE APPROPRIATENESS OF CLIENT OR THIRD-PARTY SPECIFICATIONS. IN ADDITION, CGE&Y EXPRESSLY DISCLAIMS ANY WARRANTY OR LIABILITY WITH RESPECT TO DESIGN OR LATENT DEFECTS, EURO COMPLIANCE OR COMPLIANCE WITH LAWS, REGULATIONS, OR OTHER OFFICIAL GOVERNMENT RELEASES APPLICABLE TO CLIENT, WHICH SHALL BE THE SOLE RESPONSIBILITY OF CLIENT. Client acknowledges that it is a sophisticated party to this Agreement and recognizes and agrees that the terms of this Section III are an integral part of CGE&Y's pricing and an important factor in CGE&Y's willingness to enter into this Agreement and to agree to perform Services hereunder.

G.    CGE&Y may perform the Services with personnel of CGE&Y or any of its affiliates (collectively, "CGE&Y Entities") or with subcontractors of CGE&Y Entities. CGE&Y shall be solely responsible for the performance of the Services and all of the other liabilities and obligations of CGE&Y under this Agreement, whether or not performed, in whole or part, by CGE&Y, any other CGE&Y Entity, or any subcontractor of any CGE&Y Entity. Client shall have no recourse against, and shall bring no claim against, any other CGE&Y Entity or any subcontractor of any CGE&Y Entity or any member, shareholder, director, officer, manager or employee of any CGE&Y Entity or any subcontractor of any CGE&Y Entity with respect to any liability or obligations herein or in connection with the Services.

H.    Client specifically acknowledges that CGE&Y is not providing it with legal advice. To the extent applicable to any Services provided hereunder, Client will consult with and rely exclusively on its own legal counsel for legal advice in connection with the Services, including, but not limited to, whether any aspect of the Services would constitute a benefit to, or the payment of remuneration by Client to, a physician under 42 U.S.C. § 1320a-7b and/or any relevant provision thereof, or create any other suspect or prohibited arrangement, including, but not limited to, a financial relationship and/or benefit between Client and a physician under 42 U.S.C. § 1395nn and/or any regulation thereunder.

IV.    Tools. If the Deliverables to be provided under the Letter include one or more of the proprietary tools of CGE&Y (each, a "Tool"), the additional terms and conditions regarding each Tool shall be set forth in an applicable Annex hereto, which terms and conditions shall, in addition to the other terms and conditions herein, be applicable to such Tool.

V.    Security Services. If the Services to be provided under the Letter include any technology or risk assessment or analysis services with respect to the security of the Client enterprise or the information systems of Client ("Security Risk Services"), and/or any discovery/scanning, exploitation, penetration, vulnerability assessment, related analysis, and other electronic or passive or intrusive security testing or procedures relating to the Client enterprise or the information systems of Client, using intrusive or passive techniques and/or software tools or by other means ("Security Testing Services") (the Security Risk Services and the Security Testing Services individually or collectively, "Security Services"), Client understands that some or all of such Security Services may be performed by a subcontractor to CGE&Y,

Appendix A-3

as set forth in the Letter, and that the terms and conditions set forth in Annex I hereto, which terms and conditions are hereby incorporated by reference into this Section, shall, in addition to the other terms and conditions herein, be applicable to the provision of such Security Services.

VI.   Confidentiality.

A.   In General  Neither party shall disclose to a third party Confidential Information (as defined below) of the other party. The receiving party shall use the same degree of care as it uses to protect the confidentiality of its own confidential information of like nature, but no less than a reasonable degree of care, to maintain in confidence the Confidential Information of the disclosing party. The foregoing obligations shall not apply to any information that (a) is required to be disclosed by law, subpoena or other process, (b) is disclosed to a subcontractor of a CGE&Y Entity in connection with its performance of the Services, or (c) is disclosed in connection with any dispute, claim or action between the parties. Confidential Information means information related to the subject matter of the Letter and any of the projects thereunder (including any third party information), and the business of the disclosing party, which (i) derives economic value, actual or potential, from not being generally known to or readily ascertainable by other persons who can obtain economic value from the disclosure or use of the information, (ii) is the subject of efforts by the disclosing party or owner of the third party Confidential Information that are reasonable under the circumstances to maintain the secrecy of the information, and (iii) is identified by either party as "Confidential" and/or "Proprietary", or which, under all of the circumstances, ought reasonably to be treated as confidential and/or proprietary, including this Agreement. Confidential Information shall not include any information that (1) is at the time of disclosure, or thereafter becomes, through a source other than the receiving party, publicly known, (2) is subsequently learned from a third party that does not impose an obligation of confidentiality on the receiving party, (3) was known to the receiving party at the time of disclosure, or (4) is developed independently by the receiving party. The obligations of confidentiality hereunder shall continue for a period of three (3) years from the date of the last disclosure of Confidential Information hereunder.

B.   Medical and Health Information.  Client shall not disclose to CGE&Y or provide CGE&Y with access to any confidential medical or health information that includes any individually identifiable health information as defined in the Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. part 164.501 ("Confidential Health Information"), unless an authorized representative of Client and CGE&Y have agreed in advance, in writing, that disclosure or access to any such information may be provided to CGE&Y. For purposes of this Paragraph B, the authorized representatives of Client and CGE&Y are _____ and _____, respectively. Either party may change its authorized representative by notifying the other party's authorized representative in writing of another representative. CGE&Y and Client recognize that disclosure to, access by and/or use by, CGE&Y of any Confidential Health Information may implicate various federal laws governing the confidentiality of Confidential Health Information, including, but not limited to, HIPAA and similar or related state laws. Accordingly, in the event that any such Confidential Health Information is disclosed to CGE&Y hereunder, CGE&Y agrees that: (i) it shall treat such Confidential Health Information in accordance with the obligations imposed on Business Associates pursuant to 45 C.F.R. parts 164.504(e)(2) and 164.504(e)(4), and (ii) its access to and use of any Confidential Health Information will be used solely to perform its obligations hereunder, including providing the Services; provided, however, that in no event shall CGE&Y be required to perform any work that would require CGE&Y to obtain unauthorized access to any Confidential Health Information in violation of applicable federal or state laws governing such information.

VII.   Deliverables and Acceptance.

A.    Rights to Deliverables. Except with regard to any Tools, as to which the ownership and other rights shall be governed by the applicable Annex hereto pertaining to such Tools, upon full payment, CGE&Y hereby assigns to Client any and all rights, title and interest, including, without limitation, copyrights, trade secrets and proprietary rights, to the materials created by CGE&Y specifically for Client hereunder and required to be delivered to Client by virtue of their description or specification as a deliverable in the Letter (the "Deliverables"), subject to the following provisions of this Section VIII(A) and in the case of Deliverables comprising reports with respect to the security of the Client enterprise or the information systems of Client ("Security Reports"), Section V hereof. The Deliverables exclude all third party works and products whether or not included or embedded in the Deliverables. The Deliverables shall be deemed to be "works made for hire" under the federal copyright laws. CGE&Y agrees to give Client reasonable assistance, at Client's expense, to perfect such assignment of such rights, title and interest. However, the Deliverables may include data, modules, components, designs, utilities, subsets, objects, program listings, tools, models, methodologies, programs, systems, analysis frameworks, leading practices, and specifications (collectively, "Technical Elements") owned or developed by CGE&Y prior to, or independently from, its engagement hereunder (and any modifications or enhancements to CGE&Y's Technical Elements developed in the course of performing the Services) (collectively, "CGE&Y Technical Elements") and CGE&Y retains exclusive ownership rights to all CGE&Y Technical Elements. Accordingly, to the extent that any such CGE&Y Technical Elements are integrated into any Deliverables, CGE&Y hereby grants to Client a perpetual, worldwide, non-exclusive, paid-up, limited license to use, copy and modify such CGE&Y Technical Elements as integrated into such Deliverables for internal purposes only. Notwithstanding anything to the contrary contained herein, CGE&Y retains all rights to its knowledge, experience and know-how (including processes, ideas, concepts and techniques) acquired in the course of performing the Services, and Client hereby grants to CGE&Y a perpetual, worldwide, paid-up license to use, copy, modify and sublicense, in the course of CGE&Y's business, any Technical Elements acquired or developed hereunder.

B.    Acceptance. If Client reasonably determines that a Deliverable fails in any material respect to meet the specifications and/or other acceptance criteria mutually agreed upon by the parties, Client shall (a) promptly, after the delivery by CGE&Y of such Deliverable, notify CGE&Y in writing of such failure, and (b) specify in reasonable detail the nature and extent of such failure. Upon receipt of such notice, CGE&Y shall, solely through the performance of additional Services, make such adjustments, modifications or revisions as are necessary to cause such Deliverable to so meet the specifications and/or other acceptance criteria mutually agreed upon by the parties, and either: (i) in the case of a non-software Deliverable, re-submit such Deliverable to Client for Client's review; or (ii) in the case of a Deliverable that comprises software, notify Client that such Deliverable is ready for re-testing. At such time as such a Deliverable so meets such specifications and/or other acceptance criteria, Client shall issue a writing indicating its acceptance of such Deliverable. In any case, each such Deliverable shall be deemed accepted unless rejected in writing within ten (10) calendar days of the delivery by CGE&Y of such Deliverable. Notwithstanding the rejection of any Deliverable by Client, operational use of such Deliverable shall be deemed to constitute acceptance thereof. Once accepted, Client may not thereafter reject any interim Deliverable, provided that acceptance of a composite Deliverable may be conditioned upon the appropriate integration and operation of such previously accepted interim Deliverable into such composite Deliverable, to the extent required by the applicable specifications or acceptance criteria.

VIII.    Term and Termination. This Agreement will terminate when the Services have been performed. Either party may terminate this Agreement in the event of a material breach of this Agreement by the other party (which shall include any failure by Client to make timely payment of any fees or reimbursement of expenses due under this Agreement), which breach is not cured within thirty (30) days, or such other reasonable period if the breach (other than for non-payment) cannot reasonably be cured within thirty (30) days after receipt of written notice by the non-breaching party. The failure to cure such

breach as stated in the preceding sentence shall result in the termination of this Agreement. Client shall pay CGE&Y for all fees and expenses incurred through the effective date of termination, provided that such payment shall not affect any other rights and remedies CGE&Y may have under this Agreement. In the event that CGE&Y terminates this Agreement due to a breach by Client, CGE&Y shall also be entitled to be paid a redeployment fee in an amount equal to twenty percent (20%) of the total amount of all fees for unperformed Services that are being terminated. Any such payments shall not affect any other rights or remedies CGE&Y may have under this Agreement. The provisions of this Agreement which give the parties rights beyond termination of this Agreement will survive any termination of this Agreement, including, without limitation, Section III (Warranty and Liability), Section IV (Tools), Section V (Security Services), Section VI (Confidentiality), Section VII(A) (Rights to Deliverables), Section X (Taxes and Payment), Section XII (Non-Solicitation), Section XIV (Dispute Resolution; Equitable Relief), Section XVI (Closure), Section XVIII (Publicity) and Section XX (No Third Party Beneficiaries).

IX.    Bankruptcy. Either party may terminate this Agreement and all Letters into which this Appendix A may be incorporated, effective immediately upon giving notification thereof in the event the other party is adjudged insolvent or bankrupt, or upon the institution of any proceeding against the other party seeking relief, reorganization or arrangement under any laws relating to insolvency, or for the making of any assignment for the benefit of creditors, or upon the appointment of a receiver, liquidator or trustee of any of the other party's property or assets, or upon liquidation, dissolution or winding up of the other party's business.

X.    Taxes and Payment. Any applicable taxes incurred in connection with the Services and Deliverables, including any Tools provided hereunder, (except for taxes imposed on entity income), will be billed to, and paid by, Client, in addition to fees and expenses. Payment by Client of CGE&Y's fees, expenses and any applicable taxes shall be due within thirty (30) days of CGE&Y's invoice unless otherwise specified in the Letter. CGE&Y may change the address to which payments are to be sent by Client at any time by giving Client written notice of such change. If any amount is not paid within thirty (30) days after it becomes due, Client shall also pay CGE&Y interest on that amount for the period from its due date until it is paid in full. That interest shall be calculated at a rate equal to twelve percent (12%) per annum (or the maximum rate permitted by applicable law, if lower), and shall be payable on demand.

XI.    Conflict. In the event of any conflict, ambiguity or inconsistency between this Appendix A on the one hand, and any other document to which this Appendix A may be annexed or which may be annexed to this Appendix A (other than Annex I and each applicable Annex pertaining to Tools), including any terms and conditions on Client's purchase orders or otherwise, on the other hand, the terms and conditions of this Appendix A shall govern; and in the event of any conflict, ambiguity or inconsistency between this Appendix A on the one hand, and Annex I or an applicable Annex pertaining to Tools on the other hand, the terms and conditions in such Annexes shall govern.

XII.    Non-Solicitation. During the term of this Agreement and for a period of one (1) year following its termination, neither party shall, as a result of becoming aware of any employee of the other party who is connected with the performance of this Agreement, directly or indirectly solicit or hire (or utilize as an independent contractor) such employee.

XIII.    Severability. If any provision of this Agreement, or the application thereof, shall for any reason and to any extent be determined by a court of competent jurisdiction to be invalid or unenforceable, such provision shall be modified or interpreted by the court so as best to reasonably effect the intent of the parties and the parties shall replace any such invalid or unenforceable provision with valid and enforceable provision(s) that are consistent with the modification or interpretation made by the court. All other provisions of this Agreement shall remain in full force and effect.

XIV.    Dispute Resolution; Equitable Relief.

A.    The parties will attempt in good faith to resolve any controversy or claim arising out of or relating to this Agreement or the Services through discussions between the CGE&Y Vice President and the Client executive responsible for providing and accepting the Services. If these discussions are unsuccessful, the parties agree that any action asserting a claim by one party against the other party hereto arising out of or relating to this Agreement or the Services must be brought in the state or federal court for the county or district wherein the party against which the claim is brought has its principal place of business. Notwithstanding the foregoing, any action asserting a claim for collection of fees, expenses and/or other compensation due or owing to CGE&Y under this Agreement may be brought in a state or federal court in New York, New York, which for purposes of this Agreement, is CGE&Y's principal place of business. If an action is pending on any claims between the parties, any claim which could be brought as a counterclaim must be brought in the pending action, if at all. The parties further agree to waive any right to a jury trial that either party might otherwise have in any and all courts.

B.    The parties acknowledge that the breach of Section IV (Tools), Section VI (Confidentiality), Section VII(A) (Rights to Deliverables), Section XII (Non-Solicitation) or Section 1 of Annex I (Confidentiality of advice and Security Reports) by one party will give rise to irreparable injury to the other party which is not adequately compensable in damages or at law. Accordingly, the parties agree that injunctive relief will be an appropriate remedy to prevent violation of either party's respective rights and/or obligations under those Sections. However, subject to Section III (Warranty and Liability) and any limitations in the relevant Annexes, nothing in this Paragraph B shall limit a party's right to any other remedies in equity or at law, including the recovery of damages.

XV.    Force Majeure. Neither party shall be liable for failure to fulfill its obligations under this Agreement (other than a failure to pay money) if that failure is caused, directly or indirectly, by flood, communications failure, extreme weather, fire, mud slide, earthquake, or other natural calamity or act of God, interruption in water, electricity, heating or air conditioning (depending on the season), riots, civil disorders, rebellions or revolutions, acts of governmental agencies, quarantines, embargoes, malicious acts of third parties, acts of terrorism, labor disputes affecting vendors or subcontractors and for which the party claiming force majeure is not responsible, or any other similar cause beyond the reasonable control of that party (each, a "Force Majeure Event").

XVI.    Closure. No action, regardless of form, arising out of or in connection with this Agreement or the Services may be brought by either party more than one (1) year after the cause of action accrued, provided that this Section shall not serve to preclude or limit any claim that CGE&Y may have after said period for payment by Client for Services performed hereunder.

XVII.    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its choice of law principles.

XVIII.    Publicity. Notwithstanding anything to the contrary in this Agreement, Client hereby authorizes CGE&Y to make public reference to Client's selection of the CGE&Y service line(s) and the nature of the Services provided. Subject to Client's prior written consent, CGE&Y may publicly refer to the solution implemented or to be implemented by CGE&Y and may write and publish a high-level profile discussing the reasons supporting Client's choice of the CGE&Y solution and the benefits gained by Client. Moreover, CGE&Y may, from time to time, request Client's assistance in complying with the process employed by CGE&Y to measure client satisfaction, as may be stated in the Letter.

XIX.    Assignment. Neither this Agreement nor any of the rights or duties hereunder may be assigned or otherwise transferred by either party without the other party's prior written consent; provided, however.

that CGE&Y may assign or otherwise transfer its rights or duties under this Agreement to another member of the Cap Gemini S.A. group. Any act which is inconsistent with the terms of this Section shall be null and void *ab initio*.

XX.    No Third Party Beneficiaries. This Agreement is entered solely by and between, and may be enforced only by, CGE&Y and Client. Except as set forth in Sections IV and V (including each applicable Annex pertaining to Tools and Annex I, respectively) and Section III(G), this Agreement shall not be deemed to create any rights in or obligations to any third parties.

Appendix A-8